GREGORY A. KASPER
kasperg@sec.gov
JODANNA L. HASKINS (*pro hac vice* application forthcoming)
haskinsjo@sec.gov
IAN J. KELLOGG (*pro hac vice* application forthcoming)
kelloggi@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                        Plaintiff,<br><br>     - against –<br><br>JOSHUA A. WEISS and GRAINNE M. COEN,<br><br>                                        Defendants. | **Case No. 24-cv-06988**<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission"), for its

Complaint against Joshua A. Weiss ("Weiss") and Grainne M. Coen ("Coen") (collectively

referred to herein as "Defendants"), alleges as follows:

## SUMMARY

1.      Weiss, the former Chief Financial Officer ("CFO") of Kubient, Inc. ("Kubient"),

and Coen, a former Kubient Board of Directors member and audit committee chair, engaged in a

scheme to mislead Kubient's investors and independent auditor as to its 2020 revenue.

2.      On the same day that Kubient launched a secondary public offering of its stock,

Weiss and Coen learned that Kubient had not in fact provided important services supporting a

meaningful amount of the revenue that the company was touting to promote the offering. Despite

their senior roles in the company, neither properly investigated what they learned or took any

steps to correct the offering materials; instead, they perpetuated the scheme by lying to Kubient's

independent auditor and making false statements to the investing public concerning the revenue at issue.

3.    In advance of Kubient's initial public offering ("IPO") conducted in August 2020, Kubient's Chief Strategy Officer, President, and Chairman—and later Chief Executive Officer ("CEO")—caused Kubient to fraudulently inflate its revenue and asserted that the revenue demonstrated that Kubient's flagship product, Kubient Artificial Intelligence ("KAI"), was successful. In reality, KAI, a product that purportedly detects real-time fraud during digital advertising auctions, had not generated any meaningful revenue. The CEO fabricated fraud analyses that he claimed were prepared by KAI for two customers as part of beta tests despite Kubient not obtaining the customers' data to analyze. Kubient claimed it received over $1.3 million in "revenue" for analyzing the customers' data when, in fact, Kubient never performed the analyses to generate revenue. Kubient raised approximately $12.5 million through its IPO.

4.    Kubient then launched its secondary public offering on December 22, 2020. On that same day, Weiss and Coen learned that the beta tests had not been performed. Despite learning this, neither investigated the circumstances of Kubient recording the $1.3 million in revenue, and instead both continued the CEO-initiated scheme. They did not correct the public statements to investors about the tests and the associated revenue, and indeed made additional false statements in Kubient's later public filings. In addition, Weiss and Coen both lied to Kubient's independent auditor about the revenue at issue and their knowledge of concerns raised internally about the transactions supporting the revenue. Their conduct allowed Kubient to continue to champion the success of KAI and the phony revenue in its secondary offering, which raised over $20 million from investors.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

5.     The SEC brings this action pursuant to the authority conferred on it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The SEC seeks a permanent injunction against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint; civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)]; an officer and director bar pursuant to the Court's equitable authority, Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and as to Weiss, disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest as well as reimbursement to Kubient pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)].

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to Securities Act Sections 20(b), 20(d), 20(e), and 22(a) [15 U.S.C. Sections §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Exchange Act Sections 21(d), 21(e), and 27(a) [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.     The Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

8.     Venue lies in this Court pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. § 78u(d) and 78aa]. Certain of the acts, practices, transactions, and courses of

business alleged in this Complaint occurred within the Southern District of New York, the

Defendants have transacted business in this District, and the Defendants worked for Kubient,

which at all relevant times had its principal place of business within this judicial district in New

York, New York.

## DEFENDANTS

9.      **Joshua A. Weiss**, age 40, is a resident of Woodmere, New York. Weiss served as

Kubient's CFO from December 23, 2019, until June 1, 2024. Previously, he was a senior audit

manager with a national auditing firm. Weiss is licensed as a certified public accountant ("CPA")

in New York.

10.     **Grainne M. Coen**, age 50, is a resident of Garden City, New York. At all

relevant times, Coen was a member of Kubient's Board of Directors, chair of Kubient's audit

committee, and designated as an audit committee financial expert. Coen resigned from Kubient's

board on December 1, 2023.

## RELATED ENTITY AND INDIVIDUAL

11.     **Kubient, Inc.** is a Delaware corporation based in New York, New York.

Kubient's common stock is registered with the Commission under Section 12(b) of the Exchange

Act. Kubient was quoted on the NASDAQ Capital Market under the ticker symbol "KBNT"

beginning on August 12, 2020, until it was delisted on November 17, 2023. Unsolicited

quotations for Kubient's common stock are currently quoted on OTC Link. On July 25, 2024,

Kubient filed a Chapter 7 voluntary petition for bankruptcy.

12.     **Paul D. Roberts**, age 47, is a resident of Melville, New York. He served as

Kubient's Chief Strategy Officer, President, and Chairman beginning on approximately May 15,

2019. On October 31, 2020, Roberts became Kubient's Interim CEO. On December 16, 2021,

Roberts was made CEO. Roberts resigned as Chairman and CEO/President on September 22, 2023, and November 2, 2023, respectively.

## FACTUAL ALLEGATIONS

### I. Kubient and KAI

13.    During the relevant period, Kubient was a technology company that provided services to the digital advertising industry via a cloud-based software platform.

14.    According to Kubient, its flagship product, KAI, detected fraud when companies were buying or selling advertisements on digital platforms, such as Google. These purchases were typically made during real-time auctions for that digital ad space. As digital advertising is typically priced by how often the advertisement is viewed, KAI purported to detect when those views are not by humans but by software programs designed and implemented to inflate those views to increase the price of the advertising.

### II. Kubient's IPO and Secondary Offering

15.     Kubient engaged in two securities offerings—the IPO took place in August 2020 and the secondary public offering took place in December 2020.

### A. IPO

16.    The offering materials for Kubient's IPO included an S-1 registration statement and prospectus ("IPO Offering Materials"). The final IPO Offering Materials were filed and made effective on August 11, 2020.

17.    Kubient raised approximately $12.5 million through its IPO.

### B. Secondary Offering

18.    Beginning on December 22, 2020, Kubient conducted a secondary offering of its common stock.

19.     The offering materials for Kubient's secondary offering included an S-1 registration statement and prospectus (the "Secondary Offering Materials"). The Secondary Offering Materials were filed on December 21, 2020, and made effective on December 22, 2020.

20.     Kubient raised approximately $20.7 million through its secondary offering.

**III.  Kubient, Acting Through Roberts, Falsely Inflated KAI Revenue, Resulting in Kubient Recognizing Improper Revenue as Part of a Fraudulent Scheme; After Learning that KAI Services Had Not Been Provided, Weiss and Coen Engaged in Deceptive Conduct to Further the Scheme.**

21.     Roberts engaged in deceptive acts and practices to falsely inflate KAI revenue by instructing Kubient employees to fabricate KAI fraud analysis reports; instructing Weiss to send fabricated fraud analysis reports to Kubient's independent auditor; and causing Kubient to record $1.3 million in revenue despite knowing the performance obligations associated with that revenue had not been satisfied.

22.     Prior to the first quarter of 2020, Kubient had not generated any meaningful revenue from KAI. By late 2019, running short of funds and Kubient's efforts to attract investment from private equity funds failing, Kubient planned to offer shares to the public through an IPO. For the IPO to be as successful as possible, Kubient needed to show that KAI worked effectively in detecting fraud and that there was interest in and revenue from the product.

23.     In or about the fourth quarter of 2019, Kubient entered into transactions with two customers (collectively, the "Customers") whereby (1) Kubient would provide a KAI "beta test" fraud analysis to each of the Customers for a total of $1.3 million (the "KAI Deal"), and (2) the Customers would sell data to Kubient for approximately the same dollar amount.

**A. Kubient Did Not Perform Under the KAI Deal, and Roberts Engaged in Deceptive Conduct to Hide Kubient's Failure to Perform.**

24.     The contract for the KAI Deal provided that the Customers would transfer data to Kubient, Kubient would scan that data with KAI, and Kubient would then provide KAI fraud analysis reports (the "KAI Reports") to the Customers. However, none of these contractual obligations were performed because the Customers never provided Kubient with data for a KAI analysis.

25.     In the first quarter of 2020, Kubient recorded $1.3 million in revenue for the KAI Deal, constituting nearly all of Kubient's revenue that quarter, and approximately 95% of the company's revenue at the time of its IPO in August 2020. Because the Customers never provided any data for Kubient to scan, and Kubient had not in fact performed the work contracted for, revenue should not have been recognized.

26.     Roberts knew or was reckless in not knowing, and should have known, that none of the performance obligations set forth in the contract for the KAI Deal were satisfied.

27.     During the first quarter of 2020, Weiss asked Roberts for the KAI Reports to provide to Kubient's independent auditor to support the revenue.

28.     In response, Roberts created fictitious KAI reports to support Kubient's revenue. To do so, he first instructed a Kubient employee ("Employee 1") to create two electronic folders—named for the Customers—under the pretext of creating a "sample." Roberts did not provide Employee 1 with any Customer data but told Employee 1 to populate the folders with "our own data." Employee 1 did so, inserting existing data from other Kubient customers into the folders.

29.    Roberts instructed another Kubient employee ("Employee 2") to create "sample" KAI reports, indicating that the reports would be shown to bankers during the company's upcoming IPO road show.

30.    Roberts then provided Employee 2 with the information he wanted the employee to plug into the "sample" KAI reports, including the amount of fraud KAI had purportedly detected.

31.    Employee 2 asked Roberts for the data to be analyzed by KAI. In response, Roberts told Employee 2 that there was no actual data to be analyzed and reiterated that these were simply "sample" reports.

32.    Employee 2 created the "sample" KAI Reports, as directed by Roberts, and sent them to Roberts on March 24, 2020.

33.    On March 25, 2020, the day after Employee 2 sent Roberts the KAI Reports they had prepared, Roberts emailed the reports to Weiss to provide to the independent auditor as support for the $1.3 million in revenue from the KAI Deal.

34.    In reviewing the KAI Reports, Weiss noticed the quantity of data that had been allegedly analyzed differed from the quantity of data for which the Customers had been invoiced the previous quarter. Instead of inquiring further about the discrepancy, Weiss asked Roberts if Weiss should change the numbers reflecting the quantity of data analyzed in the KAI Reports to match the numbers in the invoices, to which Roberts replied "yes."

35.    As agreed to with Roberts, Weiss then changed the KAI Reports before emailing these reports, in addition to the underlying KAI Deal contract and invoices, to the independent auditor, copying Roberts.

**B. Weiss and Coen Learned the Performance Obligations of the KAI Deal Were Not Satisfied and Engaged in Deceptive Conduct to Further the Scheme.**

36.    In late 2020, Weiss and Coen became aware that Kubient had not scanned the Customers' data underlying the KAI Deal. As alleged below, Weiss and Coen then engaged in deceptive acts and practices that perpetuated the CEO-initiated scheme by: failing to conduct due diligence to understand the circumstances of the Customers' data not being scanned; failing to correct—and continuing to make—false statements about the KAI Deal; lying to Kubient's independent auditor; and, in Weiss's case, failing to correct—and continuing to overstate—the $1.3 million in purported KAI revenue.

37.    On December 22, 2020, a high-level Kubient employee who co-developed KAI ("Employee 3") discovered that the data purportedly provided by the Customers for the KAI Deal did not originate from the Customers. After opening the electronic folders containing the data that was supposed to be analyzed in connection with the KAI Deal, Employee 3 discovered that the data originated from other Kubient customers.

38.    That same day, Employee 3 first attempted to report his findings to Weiss noting the matter was urgent. Weiss responded that he was too busy to talk to Employee 3.

39.    Thereafter on December 22, 2020, Employee 3 reported his findings to Coen. During Employee 3's conversation with Coen, Employee 3 advised Coen that Kubient had not scanned the Customers' data, that the folders purportedly holding the Customers' data contained data from other Kubient customers, and questioned whether Employee 3's discovery could be the result of fraud.

40.    Employee 3 further told Coen that if the wrong data had been scanned as part of the purported beta test, Kubient might need to restate its earnings. In response, Coen told Employee 3 that "we could all get fired."

41.     Also on December 22, 2020, Coen discussed the issue with Roberts as well as Weiss and Kubient's outside securities counsel.

42.     As a result, Roberts called a representative of the Customers on December 23, 2020.

43.     On December 28, 2020, after being asked by Weiss for an update on "last week's fiasco," Roberts told Weiss he had a "solution in place" and would send an email shortly.

44.     On December 29, 2020, Roberts sent an email to the Customers (copying Weiss) stating, in relevant part:

> During a recent internal review, we discovered that the data used during [our fraud prevention] test may not have originated from [you]. I apologize for this and would like to offer a solution that satisfies you and your team. Kubient can retest your data using KAI at no cost as per the agreement terms or offer any suitable solution you can provide. Please let me know how you would like to proceed.

45.     Later that day, the Customers responded as follows:

> After connecting with the team internally, everyone agreed that during those 90-days we received a ton of value from your team. We all appreciate the offer to rescan our traffic, however we are very satisfied with west [sic] we received . . . .

**C. Revenue is Improperly Recognized.**

46.     As noted above, in the first quarter of 2020, Kubient recognized $1.3 million in revenue based on the KAI Deal. That revenue was reflected in financial statements included in Kubient's second and third quarter 2020 Forms 10-Q, 2020 Form 10-K, and IPO and Secondary Offering Materials. The improper revenue was also reported in Kubient's earnings releases and associated Forms 8-K and earnings calls for the second and third quarters of 2020 as well as year-end 2020.

47.     The $1.3 million in revenue should not have been recognized because the performance obligations for the KAI Deal were not performed in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 606, *Revenue from Contracts with Customers* ("ASC 606"), the applicable accounting standard for revenue recognition. As such, the recognized revenue was not in conformity with Generally Accepted Accounting Principles ("GAAP").

48.     Although Weiss analyzed the $1.3 million in KAI beta test revenue under ASC 606 before learning that Kubient had not scanned the Customers' data, he did not perform a new analysis when he learned the Customers' data had not been scanned as required by the contracts. Weiss took no further action to understand why the underlying performance obligations of the contracts had not been satisfied and how that might impact the revenue recognition.

49.     Despite Weiss and Coen having signed the Secondary Offering Materials on December 21, 2020—the day before being contacted by Employee 3 and Employee 3 raising concerns about the KAI Deal—and despite the Secondary Offering materials improperly containing the $1.3 million in fraudulent revenue from a purportedly successful beta test of KAI, Weiss and Coen did not take meaningful steps to understand the circumstances underlying Employee 3's discovery, and they did not confirm or try to understand whether the Customers provided any data to Kubient, how Kubient could have analyzed the wrong data, or whether Kubient ever provided a KAI fraud analysis to the Customers.

50.     The revenue recorded from the KAI Deal was material as it constituted nearly all of Kubient's revenue for the first quarter of 2020, approximately 95% of the company's revenue at the time of its IPO in August 2020, and approximately 45% of the company's 2020 annual

revenue. Moreover, it is likely the IPO would not have been underwritten had the underwriter

known about the fraudulent KAI Deal revenue.

**D. Weiss and Coen Concealed Information About the Improperly Recognized Revenue from Kubient's Independent Auditor.**

51.     Kubient's independent auditor was engaged from at least 2019 and conducted an

audit for Kubient's 2020 fiscal year.

52.     In furtherance of the fraudulent scheme and in violation of Rule 13b2-2, in

connection with that audit, Defendants made, or caused to be made, materially false or

misleading statements to the independent auditor.

**a. Weiss and Coen Failed to Provide Corrected Information about the KAI Deal to Kubient's Independent Auditor.**

53.     In a memorandum provided to Kubient's independent auditor in May 2020

justifying Kubient's accounting treatment of the revenue from the KAI Deal, Weiss, then relying

on false information provided by Roberts, stated Kubient received the data from the Customers.

54.     When Weiss learned from Coen in December 2020 that the Customers' data had

not in fact been scanned, he did not notify Kubient's independent auditor that the previously

provided memo was inaccurate. Moreover, Weiss did not tell the independent auditor that the

supporting documentation he previously provided to the auditor, including copies of the

purported KAI Reports, should not be relied on.

55.     As a former auditor, Weiss knew or was reckless in not knowing, and should have

known, that the independent auditor would rely on the false information as part of its year-end

audit for 2020 unless it was provided the new information Weiss had learned.

56.    Weiss and Coen did not relay any of the information from Employee 3 to the independent auditor, despite Employee 3 having told Coen that if the wrong data had been scanned as part of the purported KAI beta test Kubient might need to restate its earnings.

57.    As Kubient's audit committee chair, Coen knew or was reckless in not knowing, and should have known, that the information she had learned was important to the independent auditor as part of its year-end audit for 2020.

**b.  Coen Excluded the Independent Auditor from the January 7, 2021 Audit Committee Meeting.**

58.    Coen excluded the independent auditor from the audit committee meeting at which Employee 3's concerns were discussed.

59.    Coen, as audit committee chair, circulated an agenda for a meeting of the audit committee scheduled for January 7, 2021. According to the agenda, which attached the December 29, 2020 email exchange between Roberts and the Customers, the main topic for discussion was the KAI beta test transactions.

60.    Coen invited the independent auditor to, and the independent auditor attended, every audit committee meeting held by Kubient between at least May 2020 and January 2021. However, Coen did not invite the independent auditor to, or otherwise inform the independent auditor of, the January 7, 2021 audit committee meeting.

61.    The audit committee met on January 7, 2021, and Roberts, Coen, and other members of the audit committee attended that meeting. Weiss did not attend this meeting but was aware of it taking place.

62.    No minutes were created for the January 7, 2021 audit committee meeting. Minutes were prepared for every other audit committee meeting between at least May 2020 and March 2021.

13

63.     The independent auditor had access to the minutes of Kubient's Board meetings, which it reviewed and summarized as part of its audit work. Because there were no minutes created for the January 7, 2021 audit committee meeting, the independent auditor was not aware the meeting occurred.

64.     The next audit committee meeting was held on March 19, 2021, and was attended by the independent auditor. Weiss drafted the minutes and falsely stated in the minutes of that meeting that the "Committee's last meeting" was on November 10, 2020 and did not reference the January 7, 2021 meeting. Coen then signed the minutes.

65.     Coen knew or was reckless in not knowing, and should have known, that as a result of her excluding information about the January 7, 2021 audit committee meeting from the independent auditor, the independent auditor would not learn of the information disclosed by Employee 3.

66.     Weiss knew or was reckless in not knowing, and should have known, that as a result of falsifying the March 19, 2021 audit committee meeting minutes, the independent auditor would not learn of the January 7, 2021 meeting or the information disclosed by Employee 3.

**c.  Defendants Made Misrepresentations to Kubient's Auditors.**

67.     On March 29, 2021, Weiss falsely represented in Kubient's 2020 fiscal year management representation letter to the independent auditor:

>       a.     that the 2020 financial statements were fairly presented in conformity with GAAP;

>       b.     that he was not aware of any risks that the financial statements may be materially misstated as a result of fraud; and

   c.    that he had not received any communications, nor did he have knowledge

         of, any fraud, allegations of fraud, or suspected fraud that could have a

         material effect on the financial statements.

68.    These statements by Weiss were false because the $1.3 million in purported

revenue from the KAI Deal had been improperly recognized as the beta test of the Customers'

data on which that revenue was based never took place.

69.    These statements by Weiss were false and misleading when made and Weiss

knew or was reckless in not knowing, and should have known, that the statements were false and

misleading because Weiss learned in December 2020 that the beta test of the Customers' data on

which that revenue was based never took place.

70.    During the independent auditor's 2020 year-end audit interview on March 16,

2021, Coen orally answered questions the auditor asked as part of the year-end inquiry. In

response, Coen falsely stated that she was not aware of any tips or complaints regarding the

company's financial reporting, that she and the audit committee did not have knowledge of any

fraud or suspected fraud affecting the company, and that she was not aware of any other matters

relevant to the audit.

71.    These statements by Coen were false and misleading because Employee 3 told

Coen that Kubient had not scanned the Customers' data; that the folders purportedly holding the

Customers' data contained data from other Kubient customers; questioned whether Employee

3's discovery could be the result of fraud; and informed Coen that Kubient may need to restate

its earnings as a result.

72.    These statements by Coen were false and misleading when made and Coen knew

or was reckless in not knowing, and should have known, that the statements were false and

misleading because Coen knew the KAI Deal was significant to Kubient and had been called into question by Employee 3 who specifically asked Coen whether his discovery could be the result of fraud and require a restatement. Coen also knew, or was reckless in not knowing, and should have known, that this information would be highly relevant to the independent auditor's work.

## IV.  Kubient and Defendants Made False and Misleading Statements in Offering Materials and Filings.

73.    As alleged below, Kubient's offering materials and other public filings falsely touted the success of the KAI beta test and improperly recognized the $1.3 million from the KAI Deal.

74.    Defendants made false and misleading statements regarding the success of, and revenue generated from, the KAI beta test because they knew or were reckless in not knowing, and should have known, that a beta test never occurred.

75.    Weiss also caused Kubient to continue to fraudulently recognize the $1.3 million in revenue stemming from the KAI Deal because Weiss knew or was reckless in not knowing, and should have known, that the beta test of the Customers' data on which that revenue was based never took place and, therefore, the $1.3 million in purported revenue was improperly recognized.

### A.  Kubient and Defendants Made False and Misleading Statements in Connection with Kubient's Secondary Offering.

76.    In its Secondary Offering Materials, filed on December 21, 2020, and made effective on December 22, 2020, Kubient reiterated its prior public statements touting the success of the KAI beta test and the $1.3 million from the KAI Deal in financial statements and offering materials.

77. Kubient and Defendants made the statements in the Secondary Offering Materials as the documents are attributed to Kubient and Defendants each signed the Secondary Offering Materials and had ultimate authority over the documents. As signers of the filings, Defendants were responsible for the statements, including their content and whether and how to communicate them.

78. Kubient's Secondary Offering Materials, provided, in relevant part:

> During the quarter ended March 31, 2020, we allowed two large enterprise clients to beta test KAI in a live isolated environment. Kubient was able to successfully ingest hundreds of millions of rows of data in real-time and provide our clients the ability to prevent the purchase of non-human or fraudulent advertising traffic. The results from the two beta clients indicated that KAI was identifying and preventing approximately 300% more digital ad fraud then [sic] the clients' current partners. The large volume of data ingested helped to improve our proprietary algorithms including the supervised and unsupervised version. This was invaluable as it provided us an opportunity to stress test our ability to handle large scale, concurrent input of data into our system which is then analyzed using our patent-pending proprietary machine learning technology. . . .

79. Kubient made similar false statements in other sections of its Secondary Offering Materials. For example, in a section addressing net revenues Kubient stated:

> For the nine months ended September 30, 2020, net revenues increased by $1,592,023, or 984%, to $1,753,851 from $161,828 for the nine months ended September 30, 2019. The increase was primarily due to approximately $1,300,000 of revenue generated in connection with beta testing of KAI, our fraud detection service, which commenced during the 2020 period. . . .

80. A reasonable investor would have understood from these statements that Kubient had successfully tested KAI with the Customers, and that the successful beta test yielded $1.3 million in revenue for Kubient.

81.    The statements in the Secondary Offering Materials were false and misleading because a KAI beta test of the Customers' data never occurred, nor could it have occurred because the Customers never provided data to Kubient to scan through KAI.

82.    The statements in the Secondary Offering Materials were false and misleading when made, and Defendants knew or were reckless in not knowing, and should have known, that these statements were false and misleading because Weiss and Coen knew that a beta test of the Customers' data never occurred. On the same day the Secondary Offering Materials became effective, Coen learned from Employee 3 that the data purportedly provided by the Customers for the KAI Deal did not originate from the Customers, and that Kubient had not scanned or performed a KAI analysis of the Customers' data as referenced in the company's IPO and Secondary Offering Materials. Coen then relayed this information to Weiss.

83.    Defendants failed to correct the statements in the Secondary Offering Materials when they knew or were reckless in not knowing, and should have known, that the statements were false and misleading.

84.    These false and misleading statements were material to investors because a reasonable investor would have understood from these statements in Kubient's Secondary Offering Materials that Kubient had successfully tested KAI with the Customers, and that the successful beta test yielded $1.3 million in revenue for Kubient.

**B.  Kubient and Defendants Made False and Misleading Statements in Kubient's 2020 Form 10-K.**

85.    In its 2020 Form 10-K, filed on March 30, 2021, Kubient repeated false statements about the KAI beta tests and associated revenue.

86.    Kubient and Defendants made the statements in Kubient's 2020 Form 10-K as the documents are attributed to Kubient and Defendants each signed the Form 10-K "as persons on

behalf of the registrant and in the capacities and on the dates indicated" and, therefore, had

ultimate authority over the document. As signers of the filings, Defendants were responsible for

the statements, including their content and whether and how to communicate them.

87.    Kubient's Form 10-K, provided, in relevant part:

> During the quarter ended March 31, 2020, we allowed two large
> enterprise clients to beta test KAI in a live isolated environment. We
> were able to successfully ingest hundreds of millions of rows of data
> in real-time and provide our clients the ability to prevent the
> purchase of non-human or fraudulent advertising traffic. The results
> from the two beta clients indicated that KAI was identifying and
> preventing approximately 300% more digital ad fraud then [sic] the
> clients' current partners. The large volume of data ingested helped
> to improve our proprietary algorithms including the supervised and
> unsupervised version. This was invaluable as it provided us an
> opportunity to stress test our ability to handle large scale, concurrent
> input of data into our system which is then analyzed using our
> patent-pending proprietary machine learning technology. . . .

88.    Kubient made similar false statements in other sections of its Form 10-K. For

example, in a section addressing net revenues Kubient stated:

> For the year ended December 31, 2020, net revenues increased by
> $2,722,394 or 1,533%, to $2,900,029 from $177,635 for the year
> ended December 31, 2019. The increase was primarily due to
> approximately $1,300,000 of revenue generated in connection with
> beta testing of KAI, our fraud detection service, which commenced
> during the 2020 period. . . .

89.    A reasonable investor would have understood from these statements that Kubient

had successfully tested KAI with the Customers, and that the successful beta test yielded $1.3

million in revenue for Kubient.

90.    These statements in Kubient's 2020 Form 10-K were false and misleading

because a KAI beta test of the Customers' data never occurred, nor could it have occurred

because the Customers never provided data to Kubient to scan through KAI.

91.     These statements in Kubient's 2020 Form 10-K were false and misleading when made, and Defendants knew or were reckless in not knowing, and should have known, that these statements were false and misleading because Weiss and Coen knew that a KAI beta test of the Customers' data never occurred.

92.     The false and misleading statements in Kubient's 2020 Form 10-K were material to a reasonable investor because the KAI Deal revenue constituted nearly all of Kubient's revenue for the first quarter of 2020, approximately 95% of the company's revenue at the time of its IPO in August 2020, and approximately 45% of the company's 2020 annual revenue.

**C.  Kubient and Weiss Fraudulently Recognized $1.3 Million in Revenue in Kubient's Secondary Offering Materials and 2020 Form 10-K.**

93.     The Secondary Offering Materials and 2020 Form 10-K also improperly recognized $1.3 million in revenue from the KAI Deal.

94.     As alleged above, Kubient and Weiss made the statements in the Secondary Offering Materials and 2020 Form 10-K.

95.     Kubient's Secondary Offering Materials provided, in relevant part:

> For the nine months ended September 30, 2020, net revenues increased by $1,592,023, or 984%, to $1,753,851 from $161,828 for the nine months ended September 30, 2019. The increase was primarily due to approximately $1,300,000 of revenue generated in connection with beta testing of KAI, our fraud detection service, which commenced during the 2020 period. . . .

And the financial statements included with the Secondary Offering Materials likewise reflect that net revenues have increased in those amounts.

96.     Similarly, Kubient's 2020 Form 10-K provided, in relevant part:

> For the year ended December 31, 2020, net revenues increased by $2,722,394 or 1,533%, to $2,900,029 from $177,635 for the year ended December 31, 2019. The increase was primarily due to approximately $1,300,000 of revenue generated in connection with

> beta testing of KAI, our fraud detection service, which commenced
> during the 2020 period. . . .

And the financial statements included in the Form 10-K likewise reflect that net revenues have increased in those amounts.

97.     A reasonable investor would have understood from these statements that Kubient had properly earned $1.3 million in revenue.

98.     These statements in the Secondary Offering Materials and 2020 Form 10-K were false and misleading when made, and Weiss knew or was reckless in not knowing, and should have known, that these statements were false and misleading because he learned in December 2020 that the beta test of the Customers' data on which that revenue was based never took place and, therefore, the $1.3 million in purported revenue included in the revenue reported in the Secondary Offering Materials and 2020 Form 10-K was improperly recognized

99.     Weiss failed to correct the improperly recognized revenue in the Secondary Offering Materials when he knew or was reckless in not knowing, and should have known, that the revenue was improperly recognized.

100.     These statements were material to a reasonable investor because the KAI Deal revenue constituted nearly all of Kubient's revenue for the first quarter of 2020, approximately 95% of the company's revenue at the time of its IPO in August 2020, and approximately 45% of the company's 2020 annual revenue.

**D.  Kubient and Weiss Made False and Misleading Statements in an Earnings Release Associated with Kubient's Form 8-K Filing.**

101.     Kubient also fraudulently reported the $1.3 million in revenue from the KAI Deal in an earnings release, included with its Form 8-K filing on March 30, 2021.

102.    Kubient and Weiss made the statements in the earnings release included in the March 20, 2021 Form 8-K as the document is attributed to Kubient and Weiss reviewed and approved and had ultimate authority over the document.

103.    The earnings release noted: "Net revenues increased to $2.9 million from $178,000 in 2019. The increase was primarily due to revenue generated in connection with the beta testing of KAI, in addition to a significant increased engagement from one new customer."

104.    A reasonable investor would have understood from the earnings release that KAI yielded significant revenue for Kubient in 2020.

105.    The statements in the earnings release included with the Form 8-K were false and misleading because a KAI beta test of the Customers' data never occurred, nor could it have occurred because the Customers never provided data to Kubient to scan through KAI, and the $1.3 million in purported revenue was improperly recognized.

106.    The statements in the earnings release included with the Form 8-K were false and misleading when made and Weiss knew or was reckless in not knowing, and should have known, that these statements were false and misleading because he was aware that Kubient had not scanned the Customers' data and that the $1.3 million in purported revenue was improperly recognized.

107.    The false and misleading statements in Kubient's earnings release included with the Form 8-K were material to a reasonable investor because the KAI Deal revenue constituted nearly all of Kubient's revenue for the first quarter of 2020, approximately 95% of the company's revenue at the time of its IPO in August 2020, and approximately 45% of the company's 2020 annual revenue.

**V.  Kubient, Weiss, and Coen, Directly or Indirectly, Obtained Money and Property from the False and Misleading Statements.**

108.    Kubient and Defendants, directly or indirectly, each obtained money or a financial benefit from the statements identified above. As described above, Kubient raised approximately $20.7 million from its secondary offering. In addition, Kubient obtained a financial benefit during the relevant period from issuing stock and warrants at prices that were artificially inflated from the fraudulent conduct. Weiss and Coen obtained these financial benefits for Kubient while acting as its agents.

109.    Further, on January 7, 2021, Kubient's Board of Directors awarded Weiss stock and cash bonuses which Kubient described as follows: "(i) 10,000 shares of the Company's common stock earned by Joshua Weiss during the year ended December 31, 2020 for services in connection with the Company's public offering which closed on December 28, 2020," and a "performance bonus" of $82,500 "earned in connection with [his] performance during 2020 pursuant to terms of [his] employment contract[ ] with the Company[.]"

**VI.  Defendants Furthered Kubient's Scheme to Defraud.**

110.    As detailed above, Defendants furthered Kubient's scheme to mislead its investors and independent auditor as to Kubient's 2020 revenue.

111.    Weiss committed numerous acts in furtherance of this scheme which include, as detailed above, the following:

    a.    Weiss failed to perform a new ASC 606 analysis when he learned the Customers' data had not been scanned as required by the contracts.

    b.    Weiss took no further action to understand why the underlying performance obligations of the contracts had not been satisfied and how that might impact the revenue recognition.

c.     Weiss did not take meaningful steps to understand the circumstances underlying Employee 3's discovery, did not confirm or try to understand whether the Customers provided any data to Kubient, how Kubient could have analyzed the wrong data, or whether Kubient ever provided a KAI fraud analysis to the Customers.

d.     After Weiss learned in December 2020 that the Customers' data had not in fact been scanned, he did not notify Kubient's independent auditor that the previously provided memo was inaccurate, nor did he tell the independent auditor that the supporting documentation Weiss previously provided to the auditor, including copies of the purported KAI Reports, should not be relied on.

e.     Weiss did not relay any of the information from Employee 3 to the independent auditor.

f.     Weiss drafted the minutes for the Mach 19, 2021 audit committee meeting and falsely stated therein that the "Committee's last meeting" was on November 10, 2020 and did not reference the January 7, 2021 meeting.

g.     Weiss made false representations in Kubient's 2020 fiscal year management representation letter to the independent auditor.

h.     In offering materials and other public filings, Weiss made false and misleading statements about the $1.3 million in revenue stemming from the KAI Deal and about the success of, and revenue generated from, the KAI beta test.

24

i.      Weiss allowed Kubient to improperly recognize $1.3 million in revenue for services that were not provided.

112.    Coen committed numerous acts in furtherance of this scheme which include, as detailed above, the following:

a.      Coen did not take meaningful steps to understand the circumstances underlying Employee 3's discovery, did not confirm or try to understand whether the Customers provided any data to Kubient, how Kubient could have analyzed the wrong data, or whether Kubient ever provided a KAI fraud analysis to the Customers.

b.      Coen did not relay any of the information from Employee 3 to the independent auditor.

c.      Coen excluded the independent auditor from the January 7, 2021 audit committee meeting at which Employee 3's concerns were discussed.

d.      Coen signed the minutes from the March 19, 2021 audit committee meeting which falsely stated that meeting that the "Committee's last meeting" was on November 10, 2020 and did not reference the January 7, 2021 meeting.

e.      Coen made false representations to the independent auditor during its 2020 year-end audit interview on March 16, 2021.

f.      In offering materials and other public filings, Coen made false and misleading statements about the $1.3 million in revenue stemming from the KAI Deal and about the success of, and revenue generated from, the KAI beta test.

**VII. In the Alternative, Defendants Aided and Abetted Kubient's Violations of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act.**

113.    As detailed above, Kubient engaged in deceptive acts and practices and made false and misleading statements regarding the KAI Deal and the purported resulting revenue. Defendants aided and abetted those violations by knowingly or recklessly providing substantial assistance to those violations as detailed above in Section VI, which are incorporated herein by reference.

114.    Kubient, through the conduct of Defendants and others, alleged above, engaged in deceptive acts and practices in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder and Section 17(a)(1) and (3) of the Securities Act. Weiss's, Coen's, and Roberts's scienter and negligence are imputed to Kubient. Defendants knowingly or recklessly provided substantial assistance to Kubient's violations through their conduct alleged above.

115.    Kubient also made false and misleading statements, alleged above in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and Section 17(a)(2) of the Securities Act. Weiss's, Coen's, and Roberts's scienter and negligence for these misstatements are imputed to Kubient. For each of the statements identified above in Section IV, Defendants knowingly or recklessly provided substantial assistance to Kubient's false and misleading statements through the conduct described above.

**VIII. In the Alternative, Weiss is a Control Person of Kubient for Kubient's Violations of Section 10(b) of the Exchange Act.**

116.    As CFO, Weiss had the power to direct the management and policies of Kubient and exercised control over the company's policies with respect to its financial reporting obligations.

117.    Further, as described above, Weiss was directly involved in Kubient's fraud by signing filings that falsely reported and described the revenue and the KAI Deal and making misrepresentations to the independent auditor.

118.    Accordingly, Weiss is liable as a control person under Section 20(a) of the Exchange Act for Kubient's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder set forth herein.

## IX.    Weiss Circumvented Accounting Controls and Falsified Kubient's Books, Records, and Accounts.

119.    Weiss knowingly circumvented a system of internal accounting controls and knowingly falsified, or caused to be falsified, Kubient's books, records, and accounts in violation of Exchange Act Section 13(b)(5) [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §§ 240.13b2-1].

120.    By falsely reporting $1.3 million in revenue from December 22, 2020 forward, Weiss falsified Kubient's books, records, or accounts, and also knowingly circumvented Kubient's internal accounting controls for recognizing revenue by ignoring the company's requirement that the elements of ASC 606 be met. Weiss knew that a KAI beta test of the Customers' data never occurred and, therefore, that revenue should not have been recognized.

121.    Further, in addition to falsely representing to the independent auditor that the 2020 financial statements were fairly presented in conformity with GAAP, that he was not aware of any risks that the financial statements may be materially misstated as a result of fraud, and that he had not received any communications, nor did he have knowledge of, any fraud, allegations of fraud, or suspected fraud that could have a material effect on the financial statements, Weiss failed to correct the documents provided to the independent auditor in connection with their first quarter 2020 review.

**X.  Defendants Aided and Abetted Kubient's Books and Records Violations.**

   **A.  Kubient Made False SEC Filings.**

122.    Kubient, through Defendants and others, filed a 2020 Form 10-K with the SEC that made materially false statements and omitted material information necessary to make the statements therein not misleading in violation of Exchange Act Section 13(a) [15 U.S.C. §78m(a)] and Rules 12b-20, and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1].

123.    Kubient, through Weiss and others, filed a Form 8-K with the SEC that made materially false statements and omitted material information necessary to make the statements therein not misleading in violation of Exchange Act Section 13(a) [15 U.S.C. §78m(a)] and Rule 13a-11 thereunder [17 C.F.R. §240.13a-11].

124.    Kubient's 2020 Form 10-K and the financial statements included therein, and its Form 8-K, filed on March 30, 2021, that included an earnings release for 2020, materially overstated the company's revenue by reporting $1.3 million in improper revenue from, and made material misrepresentations about, the KAI Deal.

   **B.  Kubient, Through Weiss and Others, Maintained False Books and Records.**

125.    Kubient, through Weiss and others, failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected Kubient's transactions in violation of Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

126.    Kubient's books and records reflected $1.3 million in improper revenue.

127.    Kubient, through Weiss and others, failed to document the circumstances and conclusion surrounding Kubient scanning the wrong data, the subsequent communication and resolution with the Customers, and the resulting impact on revenue recognition.

**C. Kubient, Through Weiss and Others, Failed to Maintain Accounting Controls.**

128.    By failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets, Kubient, through Weiss and others, violated Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

129.    Kubient did not have an adequate system of internal accounting controls to ensure that revenue and assets were properly evaluated, supported, and, if appropriate, recorded in the proper quarter.

130.    Among other things, after becoming a public company, Kubient, through Weiss and others, failed to document the circumstances and conclusion surrounding Kubient's scan of the wrong data, the subsequent communication and purported resolution with the Customers, and the resulting impact on revenue recognition, including the appropriate revenue amount, if any, and period in which revenue should be recognized.

131.    In addition, after becoming a public company, Kubient failed to ensure Board of Director meeting minutes were drafted and maintained so as to fully and accurately reflect matters considered by the Board, including matters that may have been relevant to revenue recognition.

**D. Defendants Aided and Abetted Kubient's Books and Records Violations.**

132.    As detailed above, Kubient violated Exchange Act Section 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11]. Defendants aided

and abetted some or all of those violations by knowingly or recklessly providing substantial assistance to those violations.

133.    Weiss provided knowing and substantial assistance to Kubient's violations of Exchange Act Section 13(a), 13(b)(2)(A), and 13(b)(2)(B) and Rules 12b-20, 13a-1, and 13a-11 thereunder by:

      a.    Signing Kubient's Form 10-K which he knew or was reckless in not knowing, and should have known, contained false and misleading statements regarding the occurrence of a KAI beta test and the $1.3 million in purported revenue;

      b.    Failing to correct the false and misleading statements in the Secondary Offering Materials; and

      c.    Misrepresenting and omitting material information to the independent auditor about the fraudulent revenue, including that he was not aware of any improper or fraudulent accounting practices at the company and had made all relevant information available to the independent auditor, once he became aware the beta tests were not performed as set forth in the contracts, and preventing the independent auditor from learning they were excluded from an audit committee meeting where they would have learned about underlying issues involving the revenue recognition.

134.    Coen provided knowing and substantial assistance to Kubient's violations of Exchange Act Section 13(a) and Rules 12b-20 and 13a-1 thereunder by:

a.    Signing Kubient's Form 10-K, which she knew or was reckless in not knowing, and should have known, contained false and misleading statements regarding the occurrence of a KAI beta test;

b.    Failing to correct the false and misleading statements in the Secondary Offering Materials; and

c.    Misrepresenting and omitting material information to the independent auditor about the revenue at issue and her knowledge of concerns raised internally about the transactions supporting the revenue, and excluding the independent auditor from a meeting where they would have learned about these issues.

**XI. Weiss is a Control Person of Kubient for Kubient's Books and Records Violations.**

135.    As CFO, Weiss had the power to direct the management and policies of Kubient and exercised control over the company's policies with respect to its financial reporting obligations.

136.    Further, as described above, Weiss was directly involved in Kubient's fraud by signing filings that falsely reported and described the revenue and the KAI Deal and making misrepresentations to the independent auditor.

137.    Accordingly, Weiss is liable as a control person under Section 20(a) of the Exchange Act for Kubient's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-11 thereunder set forth herein.

**XII.  Weiss Falsely Certified that Kubient's 2020 Form 10-K Fairly Presented the Financial Condition and Results of the Company.**

138.    Weiss signed Kubient's 2020 Form 10-K certification on March 29, 2021, which materially overstated Kubient's revenue, and falsely certified that those filings fairly presented,

in all material respects, the financial condition and results of operation of the company in violation of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## XIII.    Weiss Failed to Reimburse Kubient for Bonuses.

139.    Section 304(a) of the Sarbanes-Oxley Act ("SOX") requires, among other things, the CFO of any issuer required to prepare an accounting restatement due to material non-compliance with financial reporting requirements under the securities laws as a result of misconduct to reimburse the issuer for any bonuses or other incentive or equity based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission of the misstated document.

140.    Kubient was required to file, and should have filed, restatements of several filings, including its Forms S-1 and prospectuses for its IPO and secondary offering, its second and third quarter 2020 Forms 10-Q, and its 2020 Form 10-K, all of which materially overstated the company's revenue as a result of misconduct by Roberts and later Weiss.

141.    Weiss was CFO when Kubient filed its Form S-1 on August 10, 2020, triggering the 12-month clock under Section 304.

142.    Weiss received cash bonuses of at least $82,500 plus stock awards during this 12-month period.

143.    Weiss has not reimbursed any bonus amount or stock award to Kubient.

### FIRST CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities – Violations of Securities Act Section 17(a)**
**(Against Both Defendants)**

144.    The Commission realleges and incorporates by reference paragraphs 1 through 143, as though fully set forth herein.

145.    By virtue of the foregoing, Defendants, directly or indirectly, in the offer or sale of a security by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails:

    (a)    employed a device, scheme, or artifice to defraud;

    (b)    obtained money or property by means of an untrue statement of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

146.    Defendants engaged in this conduct intentionally, knowingly, or with severe recklessness.

147.    Accordingly, Defendants, directly or indirectly, violated, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
**Fraud in the Offer or Sale of Securities –
Aiding and Abetting Kubient's Violations of Securities Act Section 17(a)
(Alternatively, Against Both Defendants)**

148.    The Commission realleges and incorporates by reference paragraphs 1 through 147, as though fully set forth herein.

149.    By virtue of the foregoing, the Defendants provided knowing and substantial assistance to Kubient, who, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    (a)    employed a device, scheme, or artifice to defraud;

(b)     obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or

(c)     engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

150.     Accordingly, the Defendants aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### **THIRD CLAIM FOR RELIEF**
**Fraud – Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Against Both Defendants)**

151.     The Commission realleges and incorporates by reference paragraphs 1 through 150, as though fully set forth herein.

152.     By engaging in the conduct described above, Defendants, directly or indirectly, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon any person in connection with the

purchase or sale of any security.

153.    Accordingly, Defendants, directly or indirectly, violated and unless enjoined will

again violate, Exchange Act Section 10(b) [15 U.S.C § 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
**Fraud – Control Person Liability under Section 20(a) of the Exchange Act for Kubient's
Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
(Alternatively, Against Weiss)**

154.    The Commission realleges and incorporates by reference paragraphs 1 through

153, as though fully set forth herein.

155.    By virtue of the foregoing, Weiss exercised control over Kubient, which, directly

or indirectly, knowingly or recklessly, by use of the means or instrumentalities of interstate

commerce, or of the mails, or of a facility of a national securities exchange, in connection with

the purchase or sale of a security:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon another person.

156.    Accordingly, Weiss is liable as a control person under Section 20(a) of the

Exchange Act [15 U.S.C. § 78t(a)] for Kubient's violations of Section 10(b) [15 U.S.C. § 78j(b)]

of the Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FIFTH CLAIM FOR RELIEF
### Fraud – Aiding and Abetting Kubient's Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Alternatively, Against Both Defendants)

157.   The Commission realleges and incorporates by reference paragraphs 1 through 156, as though fully set forth herein.

158.   By virtue of the foregoing, the Defendants provided knowing and substantial assistance to Kubient, who, directly or indirectly, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security:

(a)   employed devices, schemes, or artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

159.   Accordingly, the Defendants aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SIXTH CLAIM FOR RELIEF
### Material False Statements and/or Omissions of Material Fact to an Accountant – Violation of Exchange Act Rule 13b2-2
### (Against Both Defendants)

160.   The Commission realleges and incorporates by reference paragraphs 1 through 159, as though fully set forth herein.

161.   By virtue of the foregoing, the Defendants, directly or indirectly:

(a)     Made or caused to be made a materially false or misleading statement to

an accountant or

(b)     Omitted to state, or caused another person to omit to state, any material

fact necessary in order to make statements made, in light of the

circumstances under which such statements were made, not misleading, to

an accountant in connection with, among other things, a required audit,

review or examination of the issuer's financial statements or the

preparation or filing of any document or report required to be filed with

the Commission.

162.    Accordingly, the Defendants violated, and unless restrained and enjoined will

again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**Falsified Books, Records or Accounts –**
**Violations of Exchange Act Section 13(b)(5) and Rule 13b2-1 Thereunder**
**(Against Weiss)**

</div>

163.    The Commission realleges and incorporates by reference paragraphs 1 through

162, as though fully set forth herein.

164.    By virtue of the foregoing, Weiss:

(a)     knowingly circumvented or knowingly failed to implement a system of

internal accounting controls; and

(b)     knowingly falsified, or caused to be falsified, Kubient's books, records, or

accounts.

165.    Accordingly, Weiss violated, and unless enjoined will again violate, Exchange

Act Section 13(b)(5) [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1].

## EIGHTH CLAIM FOR RELIEF
### False SEC Filings – Aiding and Abetting Kubient's Violation of Exchange Act Section 13(a) and Rules 12b-20 and 13a-1 Thereunder
### (Against Both Defendants)

166.     The Commission realleges and incorporates by reference paragraphs 1 through 165, as though fully set forth herein.

167.     By virtue of the foregoing, Defendants provided knowing and substantial assistance to Kubient, which failed to file or filed current and annual reports with the SEC which failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

168.     Accordingly, Defendants aided and abetted and, unless restrained and enjoined, will again aid and abet, Kubient's violation of Exchange Act Section 13(a) [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

## NINTH CLAIM FOR RELIEF
### False SEC Filings – Aiding and Abetting Kubient's Violation of Exchange Act Rule 13a-11
### (Against Weiss)

169.     The Commission realleges and incorporates by reference paragraphs 1 through 168, as though fully set forth herein.

170.     By virtue of the foregoing, Weiss provided knowing and substantial assistance to Kubient, which failed to file or filed an annual report with the SEC which failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

171.     Accordingly, Weiss aided and abetted and, unless restrained and enjoined, will again aid and abet, Kubient's violation of Exchange Act Rule 13a-11 [17 C.F.R. § 240.13a-11].

## TENTH CLAIM FOR RELIEF
### False SEC Filings – Control Person Liability under Section 20(a) of the Exchange Act for Kubient's Violation of Section 13(a) and  Rules 12b-20, 13a-1, and 13a-11 Thereunder
### (Against Weiss)

172.     The Commission realleges and incorporates by reference paragraphs 1 through 171, as though fully set forth herein.

173.     By virtue of the foregoing, Weiss exercised control over Kubient, which failed to file or filed current and annual reports with the SEC which failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

174.     Accordingly, Weiss is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Kubient's violation of Exchange Act Section 13(a) [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-11].

## ELEVENTH CLAIM FOR RELIEF
### False Books and Records –
### Aiding and Abetting Kubient's Violation of Exchange Act Section 13(b)(2)(A)
### (Against Weiss)

175.     The Commission realleges and incorporates by reference paragraphs 1 through 174, as though fully set forth herein.

176.     By virtue of the foregoing, Weiss provided knowing and substantial assistance to Kubient, which failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the issuer.

177.     Accordingly, Weiss aided and abetted and, unless restrained and enjoined, will again aid and abet, Kubient's violation of Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

**TWELFTH CLAIM FOR RELIEF**
**False Books and Records – Control Person Liability under Section 20(a) of the Exchange Act for Kubient's Violation of Exchange Act Section 13(b)(2)(A)**
**(Against Weiss)**

178.    The Commission realleges and incorporates by reference paragraphs 1 through 177, as though fully set forth herein.

179.    By virtue of the foregoing, Weiss exercised control over Kubient, which failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the issuer.

180.    Accordingly, Weiss is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Kubient's violation of Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

**THIRTEENTH CLAIM FOR RELIEF**
**Internal Accounting Controls – Control Person Liability under Section 20(a) of the Exchange Act for Kubient's Violation of Exchange Act Section 13(b)(2)(B)**
**(Against Weiss)**

181.    The Commission realleges and incorporates by reference paragraphs 1 through 180, as though fully set forth herein.

182.    By virtue of the foregoing, Weiss exercised control over Kubient, which failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

183.    Accordingly, Weiss is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Kubient's violation of Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

### FOURTEENTH CLAIM FOR RELIEF
**Internal Accounting Controls –**
**Aiding and Abetting Kubient's Violation of Exchange Act Section 13(b)(2)(B)**
**(Against Weiss)**

184.    The Commission realleges and incorporates by reference paragraphs 1 through 183, as though fully set forth herein.

185.    By virtue of the foregoing, Weiss provided knowing and substantial assistance to Kubient, who failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

186.    Accordingly, Weiss aided and abetted and, unless restrained and enjoined, will again aid and abet, Kubient's violations of Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

### FIFTEENTH CLAIM FOR RELIEF
**False Certifications of Annual Reports – Violation of Exchange Act Rule 13a-14**
**(Against Weiss)**

187.    The Commission realleges and incorporates by reference paragraphs 1 through 186, as though fully set forth herein.

188.    By virtue of the foregoing, Weiss signed Kubient's 2020 Form 10-K certification pursuant to Rule 13a-14 on March 29, 2021, which materially overstated Kubient's revenue, and falsely certified that those filings fairly presented, in all material respects, the financial condition and results of operation of the company.

189.    Accordingly, Weiss violated, and unless restrained and enjoined will again violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## SIXTEENTH CLAIM FOR RELIEF
### Reimbursement – Section 304(a) of SOX
### (Against Weiss)

190.    The Commission realleges and incorporates by reference paragraphs 1 through 189, as though fully set forth herein.

191.    By virtue of the foregoing, Kubient filed reports that were in material non-compliance with its financial reporting requirements under the federal securities laws from at least August 10, 2020, when Kubient's IPO was filed, to March 29, 2021, when it filed its 2020 Form 10-K. Kubient's material non-compliance with its financial reporting requirements resulting from misconduct required the company to restate, and it should have restated, the foregoing filings as well as its Forms 10-Q for the second and third quarters of 2020 and its S-1 registration statement and prospectus for its secondary offering.

192.    Weiss received or obtained, during the statutory time periods established by SOX, bonuses, incentives, and/or equity-based compensation which he failed to reimburse to Kubient.

193.    The Commission has not exempted Weiss, pursuant to Section 304(b) of SOX, from its application under Section 304(a).

194.    Accordingly, Weiss violated and, unless ordered to comply will continue to violate, Section 304(a) of SOX [15 U.S.C. § 7243(a)].

### RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

Find that Defendants committed the violations alleged in this Complaint;

## II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants from violating, directly or indirectly, the laws and rules alleged in this Complaint;

## III.

Order Weiss to disgorge all ill-gotten gains received during the period of the violative conduct, plus prejudgment interest thereon, pursuant to the Court's equitable powers, Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## IV.

Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## V.

Order Weiss to reimburse Kubient as required by SOX Section 304(a) [15 U.S.C. § 7243].

## VI.

Pursuant to the Court's inherent equitable authority, Securities Act Section 20(e) [15 U.S.C. § 77t(e)], and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)], bar each Defendant from acting as an officer or director of a public company;

## VII.

Grant such other relief as this Court may deem just or appropriate.

## JURY DEMAND

The Commission demands a trial by jury on all claims so triable.

Dated: September 16, 2024.

<div style="margin-left: 40%;">

s/ Gregory A. Kasper
Gregory A. Kasper (NY 2735405; SDNY GK6596)
Regional Trial Counsel
Jodanna L. Haskins (*pro hac vice* application forthcoming)
Ian J. Kellogg (*pro hac vice* application forthcoming)
Trial Counsel
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
kasperg@sec.gov
haskinsjo@sec.gov
kelloggi@sec.gov

</div>